UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Crim. No. 20-232 (JRT/BRT) |
| Plaintiff, | |
| v. | REPORT AND RECOMMENDATION |
| (8) Barbara Ann Moulder, | |
| Defendant. | |

Harry Jacobs, Esq., Joseph H. Thompson, Esq., and Matthew S. Ebert, Esq., United States Attorney's Office, counsel for Plaintiff.

Daniel L. Gerdts, Esq., counsel for Defendant Barbara Moulder.

BECKY R. THORSON, United States Magistrate Judge.

On October 20, 2020, Defendant Barbara Ann Moulder was indicted on one count of conspiracy to commit mail fraud, one count of mail fraud, and one count of wire fraud, along with forty-two other Defendants in an alleged nationwide conspiracy to commit mail and wire fraud in the telemarketing of magazine subscriptions. (Doc. No. 15, Indictment.) This matter is now before the Court on Defendant Barbara Ann Moulder's Motion to Suppress Search and Seizure Evidence (Doc. No. 939), wherein she seeks to suppress evidence obtained through the execution of three search warrants – one for the initial search of her apartment (Gov't Ex. 2), one for the second search of her apartment (Gov't Ex. 3), and one for information in the servers that are associated with her email

account (Gov't Ex. 8).[1] (*See* Doc. No. 939, Def. Barbara Ann Moulder's Mot. to Suppress.) The Court held a hearing on the matter on March 3, 2022, and ordered supplemental post-hearing briefing. (Doc. No. 1167.) On April 14, 2022, Defendant Barbara Ann Moulder filed her supplemental brief (Doc. No. 1188), and on May 5, 2020, the Government filed a response opposing the motion. (Doc. No. 1196.)

This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons stated below, this Court recommends that Defendant Barbara Ann Moulder's motion, in its entirety, be denied.

## DISCUSSION

**I.    Probable Cause Standard**

The Fourth Amendment requires probable cause to be shown before a search warrant is authorized. U.S. Const. amend. IV; *United States v. Williams*, 477 F.3d 554, 557 (8th Cir. 2007). In determining whether probable cause exists, a detached and neutral judge must make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime

---

[1]  This Court refers to the Exhibit numbers as reflected on the March 3, 2022 Hearing Exhibit List. (*See* Doc. No. 1168.)

will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

II.   **Analysis**

   a.  **First Warrant to Search the Apartment**

A search warrant issued for the search of Defendant Barbara Ann Moulder's apartment on July 23, 2020.[2] (Gov't Ex. 2.) Defendant Moulder acknowledges that the

---

[2] The affiant for the affidavit submitted in support of the apartment search warrant was U.S. Postal Inspector John Western, who had been employed with the United States Postal Inspection Service for approximately thirteen years at the time and was assigned to

warrant affidavit establishes that she lived at the subject address. (Doc. No. 1188 at 2.) And Defendant Moulder also does not contest that the affidavit adequately "set forth the basics of a suspected fraud scheme involving the sale of magazine subscriptions, and described the involvement of a variety of persons in that fraud scheme." (*Id.*) She even concedes that the evidence referenced in the search warrant affidavit was sufficient for police to have probable cause to believe that a crime may have been committed. (*Id.* at 1.) She argues, however, that the search warrant lacked probable cause because the warrant application did not establish a nexus between her and her apartment and any criminal activity. (*Id.* at 2–4.)

A search warrant application must establish a nexus between evidence of a crime and the place to be searched, such that there is a "fair probability" to believe evidence will be found in the place. *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). The "requisite nexus" between the place to be searched and the evidence sought depends on the nature of the crime, reason, and logic. *United States v. Etheridge*, 165 F.3d 655, 657 (8th Cir. 1999).

The references to Defendant Barbara Ann Moulder in the affidavit cannot be taken out of context but read along with the totality of circumstances described in the affidavit, which included significant information detailing evidence of the ongoing magazine fraud by many individuals and many companies.[3] This information included information that

---

the Mail Fraud Team at the Denver Division, Twin Cities Field Office in Minneapolis, Minnesota. (Gov't Ex. 2 at ¶ 1.)

[3] The affidavit explains –

linked the suspected criminal activity to Defendant Moulder and with Defendant Moulder's apartment.

For example, the affidavit describes information learned from Individual A, a known participant in the fraudulent scheme, about how he ran his company in a fraudulent manner, by using scripts to confuse and trick consumers into signing up for expensive magazine subscription packages.[4] (Gov't Ex. 2 at ¶¶ 18–25, 27.) Individual A

---

> During the course of the investigation, law enforcement has identified more than 20 companies involved in this fraudulent magazine sales scheme. In addition to identifying companies through undercover calls, the investigation has also identified companies using a variety of other investigative methods. These methods include: (1) reviewing [Better Business Bureau] BBB complaints against companies involved in the fraudulent magazine sales; (2) interview former employees of companies involved in fraudulent magazine sales; (3) issuing more than 300 grand jury subpoenas for financial and other records of companies involved in the fraudulent magazine sales schemes; and (4) obtaining federal search warrants for more than 40 email addresses.

(Gov't Ex. 2 at ¶ 99.)

[4]    Individual A and his company Your Magazine Service, Inc. were sued by the Minnesota Attorney General's Office in June 2016 for allegedly operating a fraudulent telemarketing company that preyed on elderly and other vulnerable consumers. (Gov't Ex. 10 at ¶ 17.) In November 2017, summary judgment was granted in favor of the Minnesota Attorney General's office. (*Id.*) Following that lawsuit, the FBI and U.S. Postal Inspection Service began investigating Individual A and his company. (*Id.* ¶ 18.) In December 2018, Individual A was indicted on four counts of mail fraud and four counts of wire fraud. (*Id.* ¶ 26.) After the indictment, Individual A agreed to give proffer interviews at the U.S. Attorney's Office; at those interview, Individual A admitted that he ran his company in a fraudulent manner, and explained that his company was part of a nationwide network of fraudulent magazine companies that worked together to defraud victims. (*Id.* ¶ 27.) Individual A also stated that the buying and selling of customer lists or "lead lists" was a key component of his scheme." (*Id.* ¶ 29.) A lead list is "a list of potential customers for salespeople to call, often relying on a pre-written sales script." (*Id.*) Individual A stated that "he traded lead lists with other fraudulent magazine

also described how his company "was part of a nationwide network of fraudulent magazine companies that worked together—including by trading lead lists—to defraud victims who were extremely vulnerable and susceptible to fraud." (*Id.* ¶ 27.) Also among the information included in the affidavit was the following:

> 104. According to Individual A, Tony Moulder operates magazine sales companies in Florida, including Arco Media and Gulf Coast Readers. Individual A explained that he believed Tony Moulder uses other people and companies to do his PDS sales, and in exchange takes a percentage of their sales.
>
> . . . .
>
> 153. The investigation has shown that Tony Moulder's ex-wife, Barbara Moulder, worked as a telemarketer for Gulf Coast Readers . . .
>
> 154. According to bank records obtained during the investigation, Barabara Moulder received more than $180,000 from Gulf Coast Readers from 2016 to 2020 . . .
>
> 155. A review of Moulder's emails shows that Barabara Moulder was making telemarketing calls on behalf of Tony Moulder and his fraudulent magazine companies. On January 29, 2020, for example, Barabara Moulder sent an email with the subject line "update on file" from Subject Email 57 to Tony Moulder. In the email, Barabara Moulder complained about the poor quality of magazine sales leads. Among other things, Barbara Moulder complained that the people on the leads "say stuff like I cancelled or I'm not getting any magazines" and explained that she "said well they haven't arrived yet they are on the way" . . .
>
> 156. On February 4, 2020, Barbara Moulder sent an email with the subject line "Totals" from Subject Email 57 to Tony Moulder. In the email, Barbara Moulder provided a report on her calls that day . . .
>
> 157. On April 14, 2020, Tony Moulder sent an email from Subject Email 58 (Tonyrioindio2020@gmail.com) to Loyd Loftis at Subject Email 59 (yourbestoption2020@gmail.com) with the subject line "Barb's pay." In

---

companies" and "he also purchased lead lists from 'lead brokers'—individuals in the business of buying and selling lead lists." (*Id.* ¶ 32.)

the email, Tony Moulder said "What did her email say? Probably pay her out of the other accounts." Later that day, Loftis sent an email to Moulder from Subject Email 59. Loftis forwarded an email Barbara Moulder sent from Subject Email 57 to Loftis at Subject Email 59. The subject line was "I need to know when [I] get paid again I need some money." Loftis told Tony Moulder, "If we pay her by check I will get it overnighted to her so she can get it next day."

158.  On April 15, 2020, Loftis sent an email with the subject line "Barb's Pay" from Subject Email 59 to Tony Moulder. Loftis wrote, "Attached is Barb's payroll, it will be $1641.75. Let me know which account we are to pay it from, if it is Arco or GCR will need a signed check please." Attached to the email was a sales report showing that Barbara Moulder had sold more than $16,000 worth of magazine subscriptions between April 1 and 15, 2020 . . . .

159.  According to U.S. Postal Service records, between approximately April 16 and July 16, 2020, Barbara Moulder received approximately five Express Mail packages at the Subject Premises from Gulf Coast Readers Inc. in Cape Coral, Florida.

160.  According to a U.S. Postal Service report, on or about July 18, 2020, the U.S. Postal Service delivered an express mail package addressed to Barbara Moulder at the Subject Premises. The return address indicated that Tony Moulder sent the package from Your Best Option Inc. in Cape Coral, Florida.

(Gov't Ex. 2 at ¶¶ 104, 153–60.) The affiant officer further explains that, based on his experience and training, he knows that –

a.  Businesses generally maintain or keep journals, ledgers, bank statements and records, receipts, invoices and other documents evidencing the receipts and disbursements of funds, inventories, assets of the business and personnel information. These records are usually kept and maintained for extended periods of time, often several years, at **the place of business or residence**. I know from previous investigations that such records are also often maintained **at the residence** of subjects.

b.  Individuals, including those receiving income from fraud schemes, often maintain **within their residence** records of assets and financial transactions . . . . These records are often maintained for extended periods of time, often several years.

7

(Gov't Ex. 2 at ¶ 4 (emphasis added).)

As shown in the above cited paragraphs (and other paragraphs in the affidavit not iterated above), the affidavit sufficiently describes Defendant Barbara Ann Moulder's connection with Gulf Coast Readers, activity that linked Gulf Coast Readers with the fraudulent magazine scheme, and information that linked Defendant Moulder and her residence to the company's business dealings. What is required for the search warrant to be constitutionally valid is a "fair probability" to believe—based on the search warrant affidavits—evidence will be found in the residence. *Tellez*, 217 F.3d at 550. This Court concludes that the totality of the information in the affidavit provided support for a fair probability that evidence of the magazine fraud scheme would be found in the data recovered from Barbara Moulder's home. *See United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011) (finding probable cause existed to issue a search warrant for the residence of the defendant, a participant in a fraud scheme, when the defendant had a personal office at his home with a desk and computer, and he received mail of a financial nature there); *see also United States v. Keele*, 589 F.3d 940, 943–44 (8th Cir. 2009) (holding that an agent's affidavit explaining their experience with how people utilize their residences for illicit behavior was sufficient for a nexus after knowing that the defendant was engaged in some illegal activity); *United States v. Walker*, No. 11-381 (SRN/JJG), 2014 WL 36635, at *6 (D. Minn. Jan. 3, 2014) ("[I]ndividuals often retain documentation of assets and finances at their homes."). Therefore, Defendant Moulder's motion to suppress as it relates to the first search warrant for her apartment should be denied.

b. **Second Warrant to Search the Apartment**

During the first search of Defendant Barbara Moulder's apartment, investigators discovered a marijuana and psilocybin mushroom grow operation and drug paraphernalia inside of the apartment. (Gov't Ex. 3 at ¶¶ 12–13.) The investigators then obtained a second warrant to search the apartment on July 24, 2020, authorizing the seizure of evidence of federal drug offenses.[5] (Gov't Ex. 3 at Attachment B.) The search warrant authorized the seizure of electronic evidence. (*Id.* ¶ 7 ("Cellular telephones, computers, and other devices containing electronically stored information and/or memory[.]").)

With respect to the second search warrant for her apartment, Defendant Moulder argues that evidence seized should be suppressed because "the entire basis for the alleged probable cause is evidence that is tainted from the first unconstitutional search of the residence." (Doc. No. 1188 at 4.) As stated above, the first search warrant for the residence was supported by probable cause; therefore, this argument fails.

Defendant Moulder also argues that the evidence seized should be suppressed because the search warrant affidavit did not provide probable cause to search for electronics.[6] Among the information included in the affidavit was the following:

---

[5]   The affiant was U.S. Postal Inspector John Western, the same person who had testified in the affidavit supporting the first apartment search warrant. (Gov't Ex. 3 at ¶ 1.)

[6]   Defendant seems to argue that because the affidavit referenced the "fraud scheme" in one instance, and the "telemarketing fraud" in another, that it somehow meant that the affidavit lacked probable cause to search for evidence of the drug trafficking on electronics found in the apartment. (*See* Doc. No. 1188 at 5–6.) Defendant misses the point. The affidavit specifically states that it was submitted in support of an application for a warrant to search the apartment "for evidence, fruits, and instrumentalities of

9

> 11. On July 23, 2020, Magistrate Judge Kate M. Menendez signed a federal search warrant for the Subject Premises. The search related to Moulder's participation in a mail and wire fraud scheme and conspiracy.
>
> 12. Agents executed the warrant on the morning of July 24, 2020. During the search, agents discovered a marijuana and psilocybin mushroom grow operation inside the Subject Premises.
>
> 13. The grow operation included apparent marijuana and psilocybin mushrooms, as well as drug paraphernalia and other materials that appear to be used to support the grow. For example, agents observed plastic tubs that appeared to contain psilocybin mushrooms along with a dehydrator machine. As a law enforcement agent, I am aware that dehydrators can be used to prepare psilocybin mushrooms for use . . . .
>
> 14. Based on my training, experience, and participation in drug investigations, I am familiar with how various drugs are used, the typical distribution and trafficking methods used by drug dealers and traffickers, and methods used by drug[] dealers to conceal their controlled substances and illegal proceeds. Based on my training and experience, I know that individuals trafficking in controlled substances regularly keep controlled substances in their residences . . . .

(Gov't Ex. 3 at ¶¶ 11–14.) The affiant also provided the following information specific to electronics:

> 15. Based upon my knowledge, training, experience, and the experience of other law enforcement personnel, I know that computer hardware and computer software may be utilized to store records which

---

violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1) and 846 (possession with intent to distribute controlled substances and conspiracy). (Gov't Ex. 3 at ¶ 4.a.) And, regardless of whether the affidavit references the telemarketing fraud scheme, the question is whether, based on the statements made in the affidavit, there was fair probability that evidence of the drug trafficking crime would be found in electronics found in the apartment. *See United States v. Townsley*, 843 F.2d 1070, 1076 (8th Cir. 1988) (stating that "punctilious paragraph-by-paragraph dissection of the supporting affidavit" is not the appropriate standard of review); *United States v. Leisure*, 844 F.2d 1347, 1354 (8th Cir. 1988) (declining to "undertake a piecemeal dismemberment of the various paragraphs of the affidavit without attention to its force as a whole"). As explained below, the affidavit supported finding there was such fair probability.

>include, but are not limited to: those relating to business activities, criminal activities, associate names and addresses, victims' names, addresses, and images, the identity and location of assets illegally gained through criminal activity, and other information related to criminal activity.
>
>16.  As described above and in Attachment B, this application seeks permission to search for records that might be found at the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive, cellular telephone, or other storage media . . . .

(Gov't Ex. 3 at ¶¶ 15–16.)

This Court concludes that the information provided in the affidavit, which included the above-cited paragraphs, supports finding the second search warrant for the apartment is supported by probable cause. Further, based on the information provided, there was a fair probability that evidence of drug trafficking would be found on any electronics found at the apartment. "[I]n the case of drug dealers, evidence is likely to be found where the dealers live . . . . This would logically extent to personal computers found where dealers live." *United States v. Gocha*, No. 07-2006 (MWB), 2007 WL 2471969, at *7 (N.D. Iowa Aug. 28, 2007) (quotations omitted) (finding probable cause to search for evidence of drug trafficking activities where Defendant lives, including probable cause to seize Defendant's personal computers found there). Therefore, Defendant's motion to suppress as it relates to the second search warrant for the apartment should be denied.

### c.  Search Warrant for Defendant Barbara Moulder's Email Account

Defendant Barbara Moulder also challenges the search warrant for her email account. The probable cause section in the affidavit supporting the email account search

warrant is essentially identical to the affidavit supporting the first search warrant for Defendant Moulder's apartment. Defendant Moulder similarly argues here that the affidavit supporting the search and seizure of the email account lacks probable cause because it does not establish a nexus between her email account and any criminal activity.

As stated above, the search warrant application must establish a nexus between evidence of a crime and the place to be searched, such that there is a "fair probability" to believe evidence will be found in the place. *Tellez*, 217 F.3d at 550. The following was stated in the search warrant affidavit:

> 149. A review of Moulder's emails shows that Barbara Moulder was making telemarketing calls on behalf of Tony Moulder and his fraudulent magazine companies. On January 28, 2020, for example, Barbara Moulder sent an email with the subject line "Update on file" from Subject Email 57 (bmoulder2017@gmail.com) to Tony Moulder. In the email, Barbara Moulder complained about the poor quality of magazine sales leads. Among other things, Barbara Moulder complained that the people on the leads "say stuff like I cancelled or I'm not getting any magazines" and explained that she "said well they haven't arrived yet they are on the way."
>
> 150. On February 4, 2020, Barbara Moulder sent an email with the subject line "Totals" from Subject Email 57 to Tony Moulder. In the email, Barbara Moulder provided a report on her calls that day.

(Gov't Ex. 8 at ¶¶ 149–50.) The references to Defendant Moulder and her email account cannot be taken out of context but read along with the totality of circumstances described in the affidavit, which included significant information detailing evidence of the ongoing magazine fraud by many individuals and many companies, including by Tony Moulder and Gulf Coast Readers. Considering the affidavit in total, the affidavit sufficiently

describes Barbara Moulder's connection with Gulf Coast Readers (and Tony Moulder), activity that linked Gulf Coast Readers with the fraudulent magazine scheme, and information that linked Barbara Moulder's email to the company's business dealings. Therefore, this Court concludes that the totality of the information in the affidavit provided support for a fair probability that evidence of the magazine fraud scheme would be found in the data recovered from Barbara Moulder's email account.

Defendant Moulder also argues that the warrant affidavit is "facially overbroad" because it does not state with particularization what is to be searched and seized, but instead seeks all information, all emails, and all records associated with the accounts. (Doc. No. 1188 at 6.) The Fourth Amendment protects against unreasonable searches and seizures and requires search warrants to be supported by probable cause and to "particularly describe[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement "requires particularity in the warrant, not supporting documents like an application or affidavit." *United States. v. Sigillito*, 759 F.3d 913, 923–24 (8th Cir. 2014). A warrant "must particularly describe the things to be seized, as well as the place to be searched." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (quotations omitted). This particularity requirement is met when the warrant is "sufficiently definite to enable the searching officers to identify the property authorized to be seized." *Sigillito*, 759 F.3d at 923. Courts review the particularity of a warrant based on factors such as "the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). "Although courts

sometimes treat particularity and breadth synonymously, . . . technically speaking, particularity and breadth of a warrant are separate issues." *United States v. Brown*, No. 19-cr-110 (ADM/ECW), 2019 WL 7838276, at *11 (D. Minn. Sept. 20, 2019), *report and recommendation adopted*, 2019 WL 6607240 (D. Minn. Dec. 5, 2019). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id.* (quoting *In re Grand Jury Subpoenas*, 926 F.2d 847, 856–57 (9th Cir. 1991)).

Here, the warrant identified with specificity the target account to be searched in Attachment A. Attachment B to the warrant specifically described the information sought, and also connected the evidence to be seized by the Government with the specific criminal statutes at issue (i.e., 18 U.S.C. §§ 1341, 1343, 1349). Attachment B to the search warrant also limited the scope of what items could be seized and included the temporal limitation of "January 1, 2019 to the present." (Gov't Ex. 8.) Specifically, the warrant limited the items that could be seized to the following:

> All information described above in Section I [(i.e., emails, records, files, logs, or deleted but available information)] that constitutes fruits, contraband, evidence and instrumentalities of violations of 18 United States Code, Sections 1341, 1343, and 1349, those violations involving Leisure Time Resources, Arco Media, Gulf Coast Readers, and other magazine sales companies, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:
>
> a. All documents, records, and communications related to Leisure Time Resources, Arco Media, Gulf Coast Readers, and other magazine sales companies, communications with magazine companies, magazine telemarketers, publishers, magazine brokers, lead list brokers, employees, telemarking brokers, software companies, debt collectors, debt collections

companies, magazine fulfillment representatives and companies, credit card processing representatives and companies, and magazine customers.

 b. Records related to who created, used, or communicated with the account or identifier.

 c. Evidence indicating how and when the email account was accessed or used, to determine the geographical and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner[.]

 d. All emails indicating the email account owner's state of mind as it relates to the crime under investigation[.]

 e. All emails that identify co-conspirators in the scheme to defraud consumers.

 f. All emails which evidence the planning and execution of the scheme to defraud.

(Gov't Ex. 8 at Court_00003271–3272.)

Contrary to Defendant's assertion, the warrant was not required to be more narrow than what it was. The items to be seized were limited to information shown to be relevant pursuant to the events described in the warrant affidavit. Therefore, based on the specificity provided in the Attachments, and based on the nature of the crime being investigated (i.e., a nationwide magazine sales fraud scheme evidenced through years of continued criminal activity), this Court concludes that the warrant was not lacking in particularity, nor was it overbroad. *See, e.g.*, *Matter of Search of Info. Associated with [redacted]@mac.com that is Stored at Premises Controlled by Apple, Inc.*, 13 F. Supp. 3d 157, 161, 166 (D. D.C. 2014) (finding language seeking all emails, including email content, attachments, and source and destination addresses to satisfy the Fourth Amendment's particularity requirement, stating that "the practical realities of searches for

15

electronic records may require the government to examine information outside the scope of the search warrant to determine whether specific information is relevant to the criminal investigation and falls within the scope of the warrant").

In sum, this Court concludes that the information outlined in the search warrant affidavit showed there was a reasonable likelihood that evidence of the alleged magazine fraud scheme would be found in Defendant's email account, and the Fourth Amendment's particularity requirement has been satisfied. Therefore, Defendant's motion to suppress as it relates to the email warrant (Doc. No. 939) should be denied.

### d. *United States v. Leon*

Finally, even if probable cause did not exist, the three warrants at issue (i.e., the first warrant for the apartment, the second warrant for the apartment, and the email warrant) were facially valid warrants, and therefore the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not

16

presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply to the search warrants for the email account and the apartment. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrants should not be suppressed and Defendant's motion should be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Barbara Ann Moulder's Motion to Suppress Search and Seizure Evidence (Doc. No. 939) be **DENIED**.

Date: May 31, 2022                                       *s/ Becky R. Thorson*
                                                          BECKY R. THORSON
                                                          United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **June 14, 2022**. A party may respond to those objections by **June 28, 2022**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.